CHARLES SCHWEINLER, Appellant, *v.* EDWARD EARL and Others, Respondents.

First Department, July 11, 1918.

Contract — rescission — principal and agent — action for damages based upon rescission of contract for purchase of stock induced by false and fraudulent representations — evidence — question for jury — defense — subsequent signature by purchaser of consent to liquidation of corporation and of proxy for stockholders' meeting to authorize liquidation — failure to plead defense of ratification and affirmance.

In an action to recover damages based upon the rescission of a contract whereby plaintiff purchased for the amount claimed one hundred shares of stock of a bank, the rescission was based on false and fraudulent representations made to the plaintiff by the defendant E., the president of the bank, personally, and by other defendants constituting a firm of stockbrokers through E. as their agents. It appeared that the plaintiff paid for the stock by a check made payable to the firm of stockbrokers; that said firm knowing the bank's insolvent condition wished to sell the stock, and E. who had received a loan from a member of the firm which he used to help prevent a liquidation of the bank, wanted to please said member.

*Held,* that a finding of the jury that E. was the agent of the firm of stockbrokers in the transaction in question is against the weight of the evidence, and that the verdict was properly set aside on that ground. But it was error to direct a verdict in favor of defendants, dismissing the complaint, for there was not merely a conflict in the testimony upon that issue, but conflicting and diverse inferences might be drawn from the undisputed facts, making a question for the jury.

The fact that the plaintiff after the purchase of the stock signed a consent to the liquidation of the bank without reading it and believing as E. told him that it was a consent to consolidation, and the fact that he signed a proxy for a stockholders' meeting to authorize liquidation, and thereafter attended such meeting and was made a member of the liquidating committee, he having at that time 230 shares of stock beside that in suit, did not bar his right to recover.

The plaintiff having allowed evidence bearing upon the defense of ratification and affirmance of the sale by the plaintiff to be offered and received without any objection that such defense had not been pleaded, and having further allowed the court to charge without interposing such objection, and counsel for both parties having agreed that the issue of ratification might be withdrawn from the jury and passed upon as a question of law, the defendants may urge such defense.

APPEAL by the plaintiff, Charles Schweinler, from an order of the Supreme Court, made at the New York Trial Term and entered in the office of the clerk of the county of New York on the 19th day of October, 1916, setting aside a verdict in favor of the plaintiff and directing a verdict in favor of defendants dismissing the complaint upon the merits, and also from the judgment entered in said clerk's office on the 3d day of November, 1916, dismissing the complaint pursuant to said order, and also an appeal is taken from said judgment as amended, which amended judgment was entered in said clerk's office on the 19th day of December, 1916, and from the order amending the same, which was entered in said clerk's office on the same day.

*Frederick N. Van Zandt* of counsel [*Macdonald De Witt* with him on the brief], for the appellant.

*George Gordon Battle* of counsel [*Addison A. Van Tine* with him on the brief; *O'Gorman, Battle & Vandiver*, attorneys], for the respondents.

DOWLING, J.:

The action was brought to recover the sum of $20,750 damages based upon the rescission of a contract whereby plaintiff purchased for that amount 100 shares of stock of the National Nassau Bank, the rescission being based on fraud in that false and fraudulent representations were made to plaintiff to induce him to buy the stock, the representations being made by the defendant Earl personally, and by the other defendants (constituting the firm of Taylor, Smith & Hard) through said Earl as their agent. These representations were as follows: That the National Nassau Bank was then in fine condition; that it was sound, solvent and prosperous; that it was then and had been doing a fine business and making a great deal of money; that it was as good as the Bank of England; that the shares of its capital stock were of great value and easily worth more than $207.50 each; that the shares were a good investment, and that if plaintiff bought these shares for $207.50 each, he would get a fine investment and make a large amount of money therefrom. There are allegations of plaintiff's reliance upon said representations, of

their falsity to the knowledge of defendants, of plaintiff's election to rescind the purchase promptly on discovery of the fraud, and of his tender of the stock back to defendants, together with the dividends received by him thereon, and demand for the repayment of the sum of $20,750 with interest, which was refused. At the trial the complaint was dismissed as to defendant Earl, he having received none of the proceeds of the sale.

The plaintiff was a business man and president and controlling owner of a corporation engaged in the printing business. His corporation had been a depositor in the Nassau Bank from 1908 and plaintiff had considerable dealings therewith, including the discounting of the commercial paper of his company's customers. In this way plaintiff came into personal relations with defendant Edward Earl, who had been for many years employed by the bank and who had become the president. Plaintiff came to regard Earl as his friend and banker and had implicit faith and confidence in him. He bought shares of stock on his advice, beginning as early as February 9, 1909, and plaintiff left his securities in the bank's custody. In March, 1911, the bank became a National bank under the name of " The National Nassau Bank of New York," and Earl continued as its president and as a director thereof. On May 16, 1911, on the recommendation of Earl, plaintiff bought eighty half shares of the bank stock of the par value of $50 each, paying therefor $12,400, or at the rate of $155 for each half share. Plaintiff had bought a substantial amount of various stocks on Earl's advice before the transaction in question and he apparently had unlimited faith in him, allowing his securities to remain in the vaults of the bank and apparently under Earl's complete control. The defendants other than Earl constitute the firm of Taylor, Smith & Hard, stockbrokers and members of the New York Stock Exchange. Augustine J. Smith, one of the defendants, was elected a member of the board of directors of the bank on January 9, 1912. A few days thereafter an examination of the bank by the national bank examiner was begun, which showed it was in a very bad condition, doubtful and worthless commercial paper to the extent of $381,000 being carried on its books as good assets, slow and unsatisfactory items amounting to

$276,000 more, and the examiner ordered that $300,000 of the bad assets be charged off as losses at once; that the remaining criticised items be eliminated before July 1, 1912, and that a further examination be had. Both Earl and Smith knew all about this examination and both were present on January 24, 1912, when the board of directors ordered the $300,000 charged off the books as losses. The joint examination by the clearing house examiner and the national bank examiner (begun April 9, 1912) showed slow assets of $592,780, doubtful assets of $396,214, and bad assets of $492,952, and $500,000 more of bad assets were ordered charged off at once. On April 22, 1912, the capital stock of the bank was increased from $500,000 to $1,000,000, and the par value of the shares from $50 to $100. During this time the stockholders generally received no notice of the real condition of the bank's affairs. On May 16, 1912, $499,143.74 bad assets of the bank were sold to the defendants Earl and Smith, six other directors and four other stockholders, for the sum of $250,000 cash, of which Earl and Smith paid $25,000 apiece, Earl borrowing the money from Smith. The increased capital stock was sold to stockholders at $150 a share, and the $750,000 thus realized went, $500,000 thereof to the capital account and the remaining $250,000 to surplus. A third examination was made by the clearing house examiner in January, 1913, as a result of which Earl agreed to charge off from $30,000 to $50,000 of bad paper each six months out of the bank's net earnings. The bank was in practically this same condition on March 6, 1913. On the morning of that day Earl was talking to defendant Smith over the telephone, as he did every day, to ascertain the condition of the bank's clearing house account as to debits and credits. What was said between them is a matter of importance, because it bears directly upon the plaintiff's contention that Earl was the agent of the other defendants. Those defendants had dealt in the stock of this bank, and themselves at this time owned 100 shares thereof. Earl in his examination before trial had testified as follows: " Now, Mr. Earl, how did you know on these occasions that Taylor, Smith & Hard had any stock to sell? A. I knew that they bought the stock with the idea of selling it as brokers. Q. How did you know that? A. Because they said so. Q. Who

said so? A. Mr. Smith.    Q. Said so to you?    A. Yes. * * *
Q. Did he say how much he had bought? A. They did not
have to say that; I could look at the books and see; no; he
did not say that.    * * *    Q. What did he say? A. He said
he would be glad to take any stock that came along. He said
' Can you sell it for us? ' And I said ' Yes. I have a
great many orders for the stock.' "

Upon the trial Earl strenuously and repeatedly denied that
Smith ever said to him, in words or substance, " Can you sell
it for us? " (referring to bank stock), but when finally con-
fronted with his answer last above quoted, in which he swore
that Smith said, " Can you sell it for us? " he was forced to
admit that he had given the answer and that his answer to
the question was substantially true. He testified again upon
the trial: " Q. Do you mean to say to this court here, under
oath, that Mr. Smith did not ask you to sell for Messrs. Taylor,
Smith & Hard their stock? A. I do; he did not ask me to
sell any stock for Taylor, Smith & Hard. Q. Will you look
at that question and answer? A. I see the question and I see
the answer. Q. Now, then, after reading that, do you mean
to say did not Mr. Smith ask you whether or not you could
sell some of that stock for him? A. I do not know that he
asked me could I sell stock for him. Q. What did he ask
you? A. He asked me if he bought stock for customers could
I place it for him. Q. Did he ask you whether you could sell
stock for him? A. I do not recall that he did. Q. Will you
look at that question again? A. Go ahead. Q. Did he say
' Can you sell it for us? ' A. No, he did not."

And again he swore under examination by plaintiff's coun-
sel: " Q. Now, Mr. Earl, you know the occasion which your
attention has been called to relates? A. I do. Q. On that
occasion did Mr. Smith say to you in substance that he would
be glad to take any stock that came along, of the National
Nassau Bank? A. Yes. Q. And did he say in substance to
you at that time, ' Can you sell it for us? ' A. He did not.
Q. And did you reply, ' Yes? ' [Objection by Mr. Battle.]
Q. What did he say? A. He said, ' If you have any
customers who want stock I will be glad to buy it for them.'
Q. He would be glad to what? A. Buy it for them. Q. Stock
that they owned? A. People that wanted to sell stock. Q.

First Department, July, 1918. [Vol. 183.

What? A. Smith said, ' If you have anybody who wants to buy any stock, I will be glad to buy it for them and deliver it to the bank.' "

Defendant Smith testified as to these prior conversations between himself and Earl, beginning in 1907 while Earl was cashier of the bank, in reply to questions by the court as follows: " By the Court: Q. What did he say? Tell us what talk you had, Mr. Smith? A. I cannot distinguish which particular conversation it was or how to put it, because these were continuous conversations. Q. Then give the substance of the conversations? A. The substance of it was that he had many people who wanted to buy securities, not only the Nassau Bank. ' I have been asked at the bank about a great many securities of all kinds, bonds and stocks and among them was the Nassau Bank.' He had a list, I remember it sitting alongside of his desk. * * * I did not see the names on the list. I saw there were a number of names. He stated to me, ' Here is a list of people who want to buy Nassau Bank stock. If any comes along let me know.' I told him ' I will do so.' We received circulars and we received telephone messages all the time in the office relating to all kinds of stock. If this stock was mentioned I would let him know. At some subsequent time my manager of the bond department, the outside securities department, came in to me and said — Mr. Van Zandt: I object to that. Q. Never mind what he said to you. You had another talk with him then? A. I did; I had another talk with him later. I had several talks. By Mr. Battle: Q. With Mr. Earl? A. With Mr. Earl. Q. What was the substance of it? A. I told him, ' Earl, here is some Nassau Bank stock offered. You told me you had customers that wanted it. I can sell it to them at such and such a price. Do you want it? ' He said ' I will let you know.' He would call me up after that and say ' My customer '— he would say ' It is all right, send the stock to the bank. I have communicated with my friend,' I think he said customer, he meant customer of the bank. Mr. Van Zandt: Wait a minute. Mr. Smith cannot say what Mr. Earl meant. Just state what he said. A. I am trying very hard Mr. Van Zandt, to remember. By the Court: Q. Leave out what you thought he referred to and go on. A. He would say ' Send the stock to the bank.'

I would send the stock to the bank and some subsequent time, it may have been that day or it may have been the next day a check came to the office. I did not see the check. I personally never have seen a check that I know of. Mr. Van Zandt: Pardon me. The Court: Now he is speaking of something else. He has gone a little beyond the question about the conversation. By Mr. Battle: Q. You would send the stock to the bank? A. I would send it up by messenger. Q. Did the check come down to you? A. Not to me. Q. To the firm? A. Yes. Q. Did you know the names of the persons with whom Earl was dealing? A. No. Q. Did you ever ask Mr. Earl to sell any of the stock for you? A. No. Q. Did you ever ask Mr. Earl to represent you in any way in the sale of the stock? A. No. Q. Did you ever ask him to act as your agent? A. No. [Objection by Mr. Van Zandt.] The Court: He has a right to rebut the testimony on that particular matter. Q. Did you ever say to Mr. Earl in words or substance as follows: ' Can you sell it,' that is National Nassau Bank stock, ' Can you sell it for us? ' A. No."

Smith swore positively that neither he nor his firm had ever paid or promised to pay any commission to Earl for any of the transactions in the bank's stock, nor had Earl ever received compensation, directly or indirectly, therein. Earl also testified as to the origin of his transactions with Smith as follows: " Q. About what time was it when you first broached this matter to Mr. Smith? A. Well, I was cashier of the bank, probably in 1907. Q. What did you say in substance? A. I said, ' There are a great many people after Nassau, and if you are able to get any let me know, because we have got lots of people who want to buy it.' Q. From that time on when you received an inquiry, did you communicate with Mr. Smith? A. I did. Mr. Smith called at the bank one day, and I showed him a list of people who wanted to buy stock of the bank. Q. And as you would get these inquiries, you would telephone to Mr. Smith or speak to him when you saw him, and ask him whether he could supply the stock? A. I did. Q. When you would speak to Mr. Smith what would you say to him in substance? A. I would ask him if he could get any Nassau that came along to let me know, because I had orders for it and I would like to get it. Q. So that when you got

those inquiries you communicated the fact to Mr. Smith that you had the inquiries, and asked him if he could supply the stock? A. I did."

Earl is not claimed to have had any dealings with any other defendant save Smith, and concededly Smith had no dealings with plaintiff. This was the state of the prior relations of the parties when, on the morning of March sixth, Earl had his conversation over the telephone with Smith. Earl testifies that Smith then said to him, "There is one hundred shares of Nassau in the market. Do you know anybody that wants it?" Earl said, "I think I do," and then called up plaintiff. On cross-examination he testified: "Q. You have just testified that Mr. Smith called you up and said there is 100 shares of Nassau in the market, do you know anyone that wants it or will buy it? Didn't you just testify to that? A. I did not testify that he called me. Q. Didn't you testify that Mr. Smith said to you before you talked with Mr. Schweinler there is 100 shares of Nassau in the market; do you know of anybody that wants it or wants to buy it or words to that effect? A. I testified to that. Q. In any event that conversation you had with Mr. Smith before you talked with Mr. Schweinler, didn't you? A. Yes. Q. And it was on that morning, wasn't it? A. It was. Q. And after that conversation you talked with Mr. Schweinler? A. It was. Q. Whether it was half past nine or half past ten or any other time? A. That is correct. Q. Just repeat now what he did say to you, Mr. Smith? A. He said 'Earl, there is 100 shares of Nassau in the market. Do you know anyone who wants it?' Q. And you said 'Yes, I do?' A. I said, 'I think I do. I will find out.' Q. That is you would see if you could find out if there was somebody that wanted it? A. That is correct. Q. When Mr. Smith said to you 'There is 100 shares of Nassau on the market, do you know of anybody,' what is the balance, do you know of anybody what? A. Do you know anyone who wants it. Q. What did you understand that to mean? A. He knew there was 100 shares of Nassau for sale. Did I know anybody who wanted it. Q. Who wanted to buy it? A. Yes. Q. Now then after that you called up Mr. Schweinler? A. I did."

Smith says there had been a conversation between him and

Earl almost a week prior to March sixth about these 100 shares of stock, the price for which Smith had fixed at $207\frac{1}{2}$, and that Earl said not to send the stock up that day, as his friend was away but he would advise him as soon as he (Earl) could reach his friend, who had been in the market some time to get stock, but whose name was not mentioned. On March sixth Earl called Smith up and told him to send the stock to the bank, which he did. It will be apparent from reading the record that Smith and Earl do not agree in their recollection of what passed between them that morning. In any event, Earl then called up plaintiff. Schweinler's version of what took place is as follows: " Q. Well now, Mr. Schweinler, without any further questions from me, will you tell the jury your recollection of that conversation from beginning to end, and if there was more than one conversation over the telephone that morning, let us have all of it? A. My recollection of that — of Mr. Earl's talk with me over the telephone that morning in substance was like this: ' Mr. Schweinler, I have one hundred shares of the Nassau Bank stock. I want you to buy them.' I said, ' Mr. Earl, I cannot buy Nassau Bank stock or any other stock, I haven't any money to buy stock with. I have not bought any stock in over a year as you know.' And he said, ' I know that, but this is a great chance, and I want you to buy this stock. We have been doing a great business, and are doing a great business, and this stock will make you a lot of money.' He said, ' You buy this stock.' He said, ' You make out your check for twenty thousand, seven hundred and fifty dollars, and send it down to me,' and I told him — Q. What did you say then? A. I said, ' Why, I cannot do that, I have not the money.' ' Well,' he said, ' well, take it out of your business then, take the money out of your business,' he said. I said, ' I cannot do that either, because I haven't only forty thousand dollars of a balance in the business and my pay rolls are twenty thousand dollars a week.' And he said, ' That will be all right,' he said, ' you buy this stock, if you need any money in your business I will lend it to you.' He said, ' This is a great chance and I don't want you to lose it.' And he repeated that in substance a number of times, and I in substance said, ' I didn't want it, could not buy it, did not have

First Department, July, 1918.          [Vol. 183.

money to buy it.' Eventually I said I would go upstairs and talk with my cashier, Mr. Downing, which I did."

Plaintiff further testified that when Earl said $20,700, plaintiff replied: "Why, that would make the stock two, seven and a half, and the last stock I bought was for one fifty. What is it, so much more valuable?" And Earl said, "Why yes, we have been doing a great business and are doing a great business, and making a lot of money, and this will make you a lot of money. It will go higher than two, seven and a half."

After consulting with his cashier, plaintiff called up Earl again, and after some further discussion plaintiff finally told his cashier to make out the check. "Q. Did he [Earl] say to whom the check should be made out? A. Yes, he said, ' Make the check to Taylor, Smith & Hard.' Q. What did you say when he said that? Had you ever heard of them before? A. I had heard the name before. I had in some way heard the name. Q. When he said to make out the check to Taylor, Smith & Hard, what was your reply? A. I said, ' Why,' I said, ' I thought I was buying the stock from him. I didn't know I was buying it from Taylor, Smith & Hard.' By the Court: Q. What did he say? A. He said, ' That is all right, you make out the check to Taylor, Smith & Hard, and send it up to me,'— that is what I finally did. By Mr. Van Zandt: Q. By whom did you send that up to Mr. Earl? A. By Mr. Downing, my cashier."

During the discussions, plaintiff says that Earl repeatedly said the bank was as safe as the Bank of England and also that the stock was easily worth $207\frac{1}{2}$ and plaintiff would make money if he bought it at that price.

Earl's version of his conversation with the plaintiff is radically different from the latter's. He thus explains it: " Q. What did you say? A. I said, ' Mr. Schweinler, there is one hundred shares of Nassau in the market. Do you want it? ' Q. What did Mr. Schweinler say? A. He said ' I certainly do. Send it along.' Q. What other conversation was had? A. I said ' It will cost $207.50 per share.' He said ' I do not care what it will cost me. How much do you want me to draw a check for? ' Q. Just continue; what else? A. I gave him the name of Taylor, Smith & Hard

and told him to draw the check for $20,750. Q. Was there anything else said? A. That was all there was; just ' Good day.' "

Earl denied making any of the representations charged to have been made by him.

Plaintiff, having signed his check for $20,750 to the order of Taylor, Smith & Hard, gave it to his cashier, who delivered it to Earl in the latter's office and then left. No receipt for the check was asked for. Earl swears that after his talk with Schweinler he called up Smith and told him he had a party who could take the stock. Thereafter Smith sent up the 100 shares of stock to Earl, indorsed in blank, and received from Earl plaintiff's check for $20,750. Earl placed the shares in the box in the bank's vaults where plaintiff's other securities were kept and to which Earl had free access. Plaintiff is not sure that he ever had a key to that box and he does not think he ever opened it.

On the stock thus bought by plaintiff dividends were paid. In May, 1914, plaintiff was sent for by Earl, as he testifies, who told him that there was to be a consolidation of the National Nassau Bank and the Irving National Bank; that in six months he (Earl) would be president of the combined banks, and Schweinler could get anything he wanted and have his line of credit continued. Earl then told him to sign a typewritten paper, telling him it was a consent to the consolidation of the two banks. At this time plaintiff was one of the largest stockholders in the National Nassau Bank (owning some 330 shares), and he signed the paper, which bore other names, without reading it. In fact, this paper was a consent by the stockholders to the National Nassau Bank going into voluntary liquidation. Schweinler learned that the bank was to be liquidated and returned the next day to Earl, who gave him various explanations, which apparently kept plaintiff quiet for about two weeks, when he called again on Earl at the latter's desk in the Irving Bank, where, in the presence of Earl's counsel, plaintiff produced his shares of stock, demanded back his money and threatened to go before the grand jury, but was advised by Earl to retain a lawyer. He did so, and this attorney in May, 1914, called on Earl and demanded that he take back the stock and refund the

purchase price, not only the 100 shares in question but all other stock that had been purchased by plaintiff. Earl promised to take up the last 100 shares, but when they were tendered he refused to pay back the money. At this time plaintiff claimed that he still thought he had bought Earl's own stock. He claims that he never knew it was the stock of Taylor, Smith & Hard until his attorney so informed him in August, 1914, though his check in payment for the stock was drawn to their order pursuant to Earl's directions. On June 5, 1914, plaintiff executed a proxy to vote his stock at the stockholders' meeting of the National Nassau Bank, and attended such meeting personally on June sixteenth, where his shares were voted in favor of the liquidation of the bank, and he himself was named by resolution as one of a committee of seven to liquidate the affairs of the bank. On September 2, 1914, plaintiff tendered the 100 shares of stock in suit to Taylor, Smith & Hard and demanded repayment of the purchase price, which was refused, whereupon the present action was brought.

There is no claim that the other defendants knew of Earl's misrepresentations or authorized him to make the same. The jury has found that Earl made the representations, that they were false, and that they were relied upon by plaintiff. We cannot say that these findings are against the weight of the evidence. But so finding, the defendants composing the firm of Taylor, Smith & Hard are not liable for the acts of Earl unless he was, as alleged in the complaint and sought to be proved upon the trial, the agent of the other defendants. Appellant concedes that his case must stand or fall upon a finding that Earl was the agent of the other defendants and as such made the representations in question. That he was such agent is denied by Smith, the only member of the firm who had any knowledge of the facts relative to the controversy, and by Earl himself. That he was plaintiff's agent the plaintiff emphatically repudiates. What the nature of Earl's relationship to the parties was, whether he was the agent of the firm, the agent of Schweinler, or merely an intermediary using his good offices as president to facilitate the sale and purchase of the bank's stock, is a disputed question which must largely depend upon the credit to be given to the

witnesses and the inferences to be drawn from their testimony. As favoring the theory that Earl was the firm's agent, we have his testimony given on his examination before trial that Smith said to him, " Can you sell it for us? " referring to stock in this bank; the fact that Earl solicited and urged plaintiff to buy this stock, and that plaintiff had not sought an opportunity of purchasing any; the denial of plaintiff that Earl represented him in the transaction; and the fact that Earl and Smith, knowing the bank's bad condition and critical state, were anxious to unload this stock, Smith because he wished to save the firm a loss, and Earl because he wanted to oblige Smith, who had loaned him the $25,000 he had contributed to help prevent a liquidation of the bank by a purchase of the block of doubtful assets; and the further fact that plaintiff did not pay Earl for his services. As favoring the theory that Earl was plaintiff's agent, we have the intimate and friendly relation between them, the latter's faith and confidence in the former, plaintiff's purchase of a large amount of securities on Earl's advice extending over a period of four years, the deposit of plaintiff's securities in a bank vault to which Earl had access and to which it is doubtful if plaintiff ever had access, the purchase of the stock in question on Earl's advice, the delivery of the check therefor (drawn to the order of third parties) to Earl without a receipt of any kind, the permitting the stock to be held by Earl in the bank vaults without any demand for its surrender to plaintiff or for a receipt therefor, and the fact that the firm never paid or promised to pay Earl any commission or compensation for his services in effecting the sale. It is claimed that everything done by Schweinler demonstrates his complete confidence in and reliance upon Earl, and his trust reposed in him as his adviser, banker and agent. As favoring the theory that Earl simply acted as a voluntary intermediary between buyer and seller of the bank's stock, in which as president his sole interest was to facilitate transfers and, if possible, to secure a control of the stock in holders friendly to him, we have the fact that the president of a financial institution is the source to which inquirers would naturally turn for information if they desired either to buy or sell its stock, and the further fact that Earl received no commissions

from anybody on this transaction, while an agent effecting such a sale would ordinarily be compensated therefor. A careful consideration of the whole case leads us to the conclusion that the finding of the jury that Earl was the agent of Taylor, Smith & Hard in the transaction in question is against the weight of the evidence, and that the verdict of the jury was properly set aside on that ground. But we are also of the opinion that it was error to direct a verdict in favor of defendants dismissing the complaint, for there was not merely a conflict in the testimony upon that issue, but conflicting and diverse inferences might be drawn from the undisputed facts. There was, therefore, a question requiring submission to the jury. (*Hart* v. *Hudson River Bridge Co.*, 80 N. Y. 622; *Matter of Totten*, 179 id. 112; *Gordon* v. *Ashley*, 191 id. 186; *Hirsch* v. *Jones*, Id. 195.) Nor do I think that the acts of plaintiff after his purchase of the stock barred his right to recover. He swears that when he signed the consent to the liquidation of the bank he did not read it, nor understand its purport, and that he believed it was what Earl told him — a consent to consolidation. That presented a question for the jury. While the fact that plaintiff signed a proxy for the stockholders' meeting to authorize liquidation, and thereafter attended such meeting and was made a member of the liquidating committee, might destroy plaintiff's right to rescind if he had full knowledge of the fraud committed upon him and owned no other stock save that as to which fraud had been committed, in the case at bar (1) plaintiff claims that he did not then know the details of the fraud perpetrated upon him, nor that he had been defrauded for the benefit of the firm, nor that the fraud had been committed by Earl on their behalf, and (2) plaintiff owned other shares of stock in the same bank, which would have warranted him in acting as he did, irrespective of the 100 shares of stock in question. It is not shown that plaintiff knew how many shares of stock his proxy was voting for him, and the instrument appointing such proxy did not specify any number. He owned 230 shares of stock besides the 100 in suit, and was deeply interested on account of the first mentioned holding in the future of the bank.

The only remaining question to which reference requires

to be made is, that defendants have not pleaded the defense of ratification · and affirmance by plaintiff of the sale and, therefore, are not in a position to urge the same. The answer to this is that plaintiff allowed the evidence bearing upon that defense to be offered and received without any objection that the defense had not been pleaded, and further allowed the court to charge the jury without interposing such objection. Furthermore, counsel for both plaintiff and defendants agreed that the issue of ratification might be withdrawn from the jury and passed upon as a question of law, and no suggestion was made by plaintiff at that time that such issue was not properly before the court.

The order appealed from is affirmed in so far as it sets aside the verdict in favor of plaintiff as being against the weight of the evidence; in so far as it directs a verdict in favor of defendants it is reversed. The judgment and amended judgment and the order of amendment are hereby reversed in so far as they dismiss the complaint of the plaintiff herein upon the merits as to the defendants Taylor, Smith, Hard and Stockton, and in so far as they adjudge that plaintiff take nothing by this action, and in so far as they award costs to the defendants Taylor and others against the plaintiff; and a new trial is ordered as to the defendants Taylor, Smith, Hard and Stockton, with costs to appellant to abide the event.

CLARKE, P. J., LAUGHLIN and MERRELL, JJ., concurred.

Order in so far as it sets aside verdict for plaintiff affirmed, and reversed in so far as it directs verdict for defendants. Judgment, amended judgment and order of amendment reversed as indicated in opinion, and new trial ordered as to defendants Taylor, Smith, Hard and Stockton, with costs to appellant to abide event. Order to be settled on notice.